## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TRIAD GUARANTY INC.,[1] | Case No. 13-11452 |
| Debtor. | |

### DECLARATION OF WILLIAM T. RATLIFF, III IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, William T. Ratliff, III, being duly sworn, depose and say:

1.       I am the Chairman, President, and Chief Executive Officer of Triad Guaranty Inc. (the "Debtor"), a corporation organized under the laws of the state of Delaware, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). I am authorized to submit this declaration (the "First Day Declaration") on behalf of the Debtor.

2.       As Chairman, President, and Chief Executive Officer of the Debtor, I am one of the persons responsible for devising and implementing the Debtor's business plan and strategies, overseeing the Debtor's financial and legal affairs and supervising the maintenance of its books and records. As a result of my tenure with the Debtor, my review of public and non-public documents, and my discussions with the other director and representatives of the Debtor, I am familiar with the Debtor's business, financial condition, policies and procedures, and books and records. Except

---

[1]       The last four digits of the Debtor's federal taxpayer identification number are 8519. The location of the Debtors' headquarters and the Debtors' service address is 1900 Crestwood Blvd., Birmingham, AL  35210

as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtor's retained advisors that report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code, the chapter 11 process and related legal matters are based on my understanding of such matters in reliance on the explanation provided by, and the advice of, counsel. If called upon to testify, I would testify competently to the facts set forth in this First Day Declaration.

3.      Today (the "Petition Date"), the Debtor filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtor will continue to operate its business and manage its property as a debtor-in-possession.

4.      I submit this First Day Declaration on behalf of the Debtor in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") and (b) first-day motions (the "First Day Motions"). The Debtor seeks the relief set forth in the First Day Motions with the goal of minimizing the adverse effects of the commencement of the Chapter 11 Case on its business. I have reviewed the Debtor's petition and the First Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the success of the Debtor's Chapter 11 Case.

## I.    OVERVIEW OF THE DEBTOR'S BUSINESS

### A.    <u>Introduction</u>

5.    The Debtor was formed in 1993 as the parent company of Triad Guaranty Insurance Corporation ("TGIC"), an Illinois-domiciled insurance company with its home office in Winston-Salem, North Carolina. TGIC was formed in 1987 and provided private mortgage insurance coverage in the United States in all 50 states and the District of Columbia.

6.    Mortgage insurance is issued in many home purchase and refinance transactions involving conventional residential first mortgage loans to borrowers with equity of less than 20%. If the homeowner defaults on the mortgage, mortgage insurance reduces, and in some instances eliminates, any loss to the insured lender. Mortgage insurance also facilitates the sale of low down payment mortgage loans in the secondary mortgage market. Investors and lenders also purchase mortgage insurance to obtain additional default protection or capital relief on loans with equity of greater than 20%.

7.    The adverse events in the real estate, mortgage and financial markets beginning in 2008 were unprecedented. Steep declines in real estate values, tightening markets for obtaining capital or credit, and the liquidity concerns of financial institutions created a significant amount of uncertainty in the capital markets, resulting in significant downward pressure on asset values, including single family homes. This in turn created unprecedented defaults on mortgages, including mortgages insured by TGIC. As a result, TGIC ceased issuing commitments for new

business on July 15, 2008 and entered into voluntary run-off.[2] TGIC operated its

business in run-off under the supervision of the Illinois Department of Insurance (the

"Department") for approximately 4-1/2 years.

8. On December 11, 2012, Andrew Boron, the Illinois Director of

Insurance (the "Director") issued an Administrative Order recommending that TGIC

be placed into rehabilitation.

9. Also on December 11, 2012, the Director filed a Complaint for

Rehabilitation against TGIC in the Circuit Court, Chancery Division of Cook

County, Illinois, Case No. 12 CH 43895 (the "Rehabilitation Court"), and on that

same day, the Rehabilitation Court entered an Order of Rehabilitation with a Finding

of Insolvency (the "Rehabilitation Order") against TGIC whereby the Receiver took

possession and control over all of the assets, liabilities and operations of TGIC and

the Rehabilitation Court appointed the Director as the statutory rehabilitator of TGIC

(the "Receiver").

10. Prior to the issuance of the Rehabilitation Order, TGIC entered into

voluntary run-off and was operated under an Agreed Corrective Order No. 01-2008

issued by the Director effective on August 5, 2008 (the "Initial Order") and a second

Agreed Corrective Order issued by the Director effective on March 31, 2009, as

---

[2]     The term "run-off" as used in this First Day Declaration means continuing to
        service existing mortgage guaranty insurance policies but not writing any
        new policies.

amended on May 26, 2009 (the "Second Order" and together with the Initial Order, the "Corrective Orders").

11.    Prior to the issuance of the Rehabilitation Order, the Debtor shared its corporate offices, information systems and other tangible and intangible assets with TGIC.

12.    Also prior to the issuance of the Rehabilitation Order, the Debtor and TGIC entered into a Services Agreement dated as of December 1, 2009 by and among the Debtor, TGIC and Essent Guaranty, Inc., a Pennsylvania stock insurance company ("Essent"), pursuant to which Essent provides the Debtor and TGIC with ongoing information systems maintenance and services, customer services, policy administration support, disaster recovery services and business continuity planning, as well as certain technology development services in furtherance of the run-off of TGIC's existing in-force book of business (the "Essent Agreement").

13.    Pursuant to Section 131.20a of the Illinois Insurance Code, 215 ILCS 5/131.20a and the Initial Order, the Director approved the Essent Agreement.

14.    Prior to the issuance of the Rehabilitation Order, the Debtor had no employees, the executive officers of the Debtor were also executive officers of TGIC, and many of the executive officers and employees of TGIC provided administrative and other services to the Debtor.

15.    The Debtor is a public company whose stock currently is quoted under the symbol "TGIC" on the OTCQB Pink tier operated by OTC Markets Group, a centralized electronic quotation service for over-the-counter securities. As

of January 1, 2013, the Debtor had fewer than 300 holders of record of its common stock. Therefore, on January 28, 2013, the Debtor filed a Form 15 with the Securities and Exchange Commission ("SEC") and deregistered its common stock under the Securities Exchange Act of 1934, as amended. As a result, the Debtor is no longer required to file certain reports with the SEC, including Forms 10-K, 10-Q and 8-K.

16.     The Debtor's common stock continues to be quoted on the OTC Pink tier following its deregistration, and the Debtor believes it will continue to be quoted as long as market makers demonstrate an interest in trading in the Debtor's common stock. There are approximately 17 million shares of the Debtor's common stock outstanding. Prior to the last week of May 2013, Debtor had a market capitalization of approximately $1-2 million. Since the last week of May 2013, the price of Debtor's common stock has traded up for reasons unknown to Debtor, resulting in a current market capitalization of approximately $8.1 million as of June 3, 2013.

17.     The Debtor has no significant operating activities and limited remaining cash and other assets on hand. The Debtor has been exploring various strategic alternatives, and will continue to do so from and after the Petition Date.

**B.      The Debtor's Business**

18.     The Debtor is a holding company which does not today, and never has had, employees. Prior to December 11, 2012, the Debtor, through its wholly-owned subsidiary, TGIC, was a nationwide mortgage guaranty insurer pursuing a run-off of its existing in-force book of business Unless the context requires otherwise,

references to "Triad" in this First Day Declaration refer to the operations of TGIC

and its wholly-owned subsidiary, Triad Guaranty Assurance Corporation ("TGAC").

19.    TGIC is an Illinois-domiciled mortgage guaranty insurance company

and TGAC is an Illinois-domiciled mortgage guaranty reinsurance company. The

Department is the primary regulator of both TGIC and TGAC. The Illinois Insurance

Code grants broad powers to the Department and its director to enforce rules or

exercise discretion over almost all significant aspects of Triad's insurance business.

20.    Triad ceased issuing new commitments for mortgage guaranty

insurance coverage in 2008 and prior to December 11, 2012, operated its business in

run-off under two Corrective Orders issued by the Department, as discussed in

"Corrective Orders and Regulation" below. The first Corrective Order was issued in

2008. The second Corrective Order was issued in 2009. Servicing existing policies

during run-off includes:

      (a)    billing and collecting premiums on policies that remain in force;

      (b)    working with borrowers in default to remedy the default and/or mitigate losses;

      (c)    reviewing claims filed under policies for the existence of misrepresentation, fraud or non-compliance with stated programs; and

      (d)    settling all legitimate filed claims per the provisions of the policies and the two Corrective Orders issued by the Department.

21.    The term "settled," as used herein in the context of the payment of a

claim, refers to the satisfaction of Triad's obligations following the submission of

valid claims by its policyholders. As required by the second Corrective Order,
effective on and after June 1, 2009, valid claims were settled by a combination of
60% in cash and 40% in the form of a deferred payment obligation ("DPO"). The
Corrective Orders, among other things, allowed management to continue to operate
Triad under the close supervision of the Department, included restrictions on the
distribution of dividends or interest on notes payable to the Debtor by Triad, and
included certain requirements on the payment of claims. During the third quarter of
2012, Triad reported that it was not in compliance with a provision in the second
Corrective Order.

### C.      Regulatory Matters

22.      The second Corrective Order required Triad to set aside invested
assets in an escrow account in an amount equal to the combined DPO and accrued
interest thereon. The second Corrective Order also required Triad to accrue interest
on the DPO at a rate equal to Triad's investment portfolio yield as defined in the
second Corrective Order. At September 30, 2012, the recorded DPO, including
accrued interest of $45.7 million, amounted to $765.0 million, which exceeded the
cash and invested assets of Triad at that date. Triad previously reported to the
Department that as of August 31, 2012, the aggregate amount of the DPO liability
exceeded the cash and invested assets of Triad that were available for segregation in
a separate account. Accordingly, Triad was not in compliance with this provision of
the second Corrective Order as of August 31, 2012. Triad asked the Department to
amend, modify or otherwise waive compliance with this provision of the second

Corrective Order. In addition, Triad requested that the calculation of the interest on the DPO prescribed in the second Corrective Order be amended to limit the amount to a maximum equal to the actual aggregate net investment income that Triad earns rather than an amount based on the effective rate earned by Triad on its investments.

23.     In response to Triad's requests for these modifications to the second Corrective Order, the Department held a public hearing on September 10, 2012, and invited Triad and its policyholders to provide testimony regarding these proposed amendments. In addition, the Department invited Triad and its policyholders to provide testimony as to whether Triad should be permitted to continue to run off its existing book of insurance business or whether the Department should implement a different regulatory approach, including receivership proceedings for the conservation, rehabilitation or liquidation of Triad. The Department extended the period for comments and written testimony on these matters until November 30, 2012.

**D.      The Department's Complaint for Rehabilitation**

24.     On December 11, 2012, the Department issued an Administrative Order recommending that TGIC be placed into rehabilitation, whereby the Department took possession and control over all of the assets and liabilities of TGIC. Also on December 11, 2012, the Department filed a Complaint for Rehabilitation with a Finding of Insolvency with the Circuit Court, Chancery Division of Cook County, Illinois requesting that the court enter an Order of Rehabilitation with respect to TGIC, which Order was granted. TGIC's Board of Directors consented to

the Order of Rehabilitation. Upon entry of the Order of Rehabilitation by the court, the Director of the Department was vested with possession and control over TGIC, and the Debtor ceased to have any oversight or authority over TGIC and its business affairs. The Debtor anticipates that next major step in the rehabilitation proceeding will be the filing of a plan of rehabilitation for TGIC.

        E.        **Impact of Expense Reimbursements on the Debtor's Liquidity**

        25.      Aside from its ownership of Triad, the Debtor's assets as of the Petition Date total approximately $800,000, which consist primarily of cash holdings. The Debtor currently has no outstanding debt or other known material liabilities other than potential liabilities and costs of defense associated with a pending securities law class action litigation (the "Litigation"). Specifically, with respect to such litigation, on February 6, 2009, James L. Phillips served a complaint alleging violations of federal securities laws against the Debtor and two (2) of its officers in the United States District Court for the Middle District of North Carolina (Case No. 09-00071) on behalf of a purported class of persons who acquired the common stock of the Debtor between October 26, 2006 and April 1, 2008. The Debtor filed its motion to dismiss the amended complaint on August 21, 2009 and on January 27, 2012 the Magistrate Judge recommended that the Debtor's motion to dismiss be granted. The plaintiff filed an amended complaint on March 30, 2012, the Debtor filed its motion to dismiss on May 15, 2012, the plaintiff filed its opposition to Triad's motion to dismiss on July 6, 2012, and the Debtor filed its reply brief on

August 6, 2012. On May 31, 2013, the Magistrate Judge issued an order denying

Debtor's motion to dismiss the amended complaint. This matter remains <u>sub judice</u>.

26.     The Debtor has explored strategies to acquire complementary

profitable businesses and utilize the net operating loss carryforwards ("NOLs") that

were generated on a consolidated basis with Triad in order to increase its future

value for the benefit of its stockholders as well as provide a limited benefit for Triad

policyholders. Tax laws related to the use of NOLs effectively preclude the Debtor

from raising material amounts of equity capital because such a transaction would

likely materially impair the value of the NOLs. To date, the Debtor has been

unsuccessful in identifying a viable acquisition candidate. Given the limited amount

of cash remaining at the Debtor and its inability to raise additional funds, no

assurance can be given that the Debtor will ever be successful in implementing such

a strategy.

27.     Given its current financial condition, it is unlikely that the Debtor

would be able to successfully access the capital markets to obtain long-term or short-

term debt or equity financing. Prior to December 11, 2012, the Debtor's primary

source of revenue was the reimbursement of expenses from Triad. The Debtor does

not expect to receive additional reimbursements of expenses from Triad in the future.

Investment income from the Debtor's cash holdings is immaterial. Triad is

prohibited from paying dividends or distributing assets to the Debtor without the

approval of the Department. The Debtor believes that, absent significant positive

changes in the economy and the residential real estate market, Triad's existing assets

combined with its future premiums will not be sufficient to meet Triad's current and future policyholder obligations. Therefore, none of Triad's liquid assets would be available to the Debtor and its stakeholders.

28.     The Debtor's expenses primarily consist of legal fees, fees paid to its Board of Directors, annual premiums for directors' and officers' liability insurance and general operating expenses. These expenses have ranged from approximately $100,000 to approximately $500,000 per quarter and, prior to December 11, 2012, substantially all of these expenses were reimbursed by Triad on a routine basis. The remaining assets of the Debtor will continue to be depleted each month and unless the Debtor's expenses are substantially reduced, the Debtor expects that it will have depleted all of its remaining cash by the end of 2013, or earlier, depending on the timing of any costs of defense associated with the pending securities law class action litigation.

### III.    EVENTS LEADING TO THE DEBTOR'S CHAPTER 11 FILING

### A.    Current Economic Conditions

29.     Mortgage insurance coverage, such as the coverage formerly issued by TGIC, has several attributes that make mortgage insurance companies like TGIC more susceptible to the cyclical nature of the economy in general, and the housing and labor markets in particular, than many other types of insurance companies. Mortgage insurance is generally renewable at the option of the insured at the premium rate fixed when the insurance on the loan was initially issued. As a result,

losses from increased claims from policies originated in a particular year cannot be offset by renewal premium increases on policies in force. Because TGIC recognizes its losses when it receives notices of default, the period over which TGIC generates losses can be prolonged. In addition, TGIC may not cancel the insurance coverage it issues except in the event of nonpayment of premiums or certain violations of TGIC's master policies. Therefore, the average life of a TGIC mortgage insurance policy generally has ranged from approximately four to ten years and may span a significant portion of an economic or real estate cycle. As a result, the loss ratios, which are the ratios of an insurer's incurred losses to premiums earned, of TGIC and the mortgage insurance industry are particularly affected by the cyclical nature of the U.S. economy and housing and labor markets.

30.     Continued high unemployment in the United States and the slow economic recovery (as compared to previous recoveries) in U.S. residential mortgage and housing markets are reflected in TGIC's recent elevated loss ratios.

**B.     The Order for Rehabilitation**

31.     On December 11, 2012, the Order for Rehabilitation was entered. Since then, the Department terminated much of TGIC's management. Meanwhile, against the backdrop of the Litigation and the search for an appropriate vehicle to make use of the NOLs, the Debtor's cash position continues to deteriorate without any sources for new income. Accordingly, to permit the Debtor flexibility to maximize value for stakeholders by addressing the Litigation and the NOLs, the Debtor determined to commence this Chapter 11 Case.

IV.    **FIRST DAY MOTIONS**

A.    **Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing to Continue Using its Bank Accounts and Business Forms and (B) Granting Related Relief**

32.    In furtherance of the objective of successfully administering this Chapter 11 Case and maximizing value for all stakeholders, the Debtor has filed its Motion for Entry of Interim and Final Orders (A) Authorizing to Continue Using its Bank Accounts and Business Forms and (B) Granting Related Relief (the "Cash Management Motion").

33.    The Debtor maintains one (1) checking account and one (1) money market account (together, the "Bank Accounts") at the National Bank of Commerce (the "Bank") in Birmingham, Alabama.

34.    By the Cash Management Motion, the Debtor seeks relief that I understand to be customary in similar cases. Specifically, the Debtor seeks entry of an order authorizing it to:  (a) continue to (i) use, with the same account numbers, its Bank Accounts, (ii) treat the Bank Accounts for all purposes as accounts of the Debtor as debtor-in-possession, (iii) open new debtor-in-possession accounts, if needed; (iv) use, in their present form, all correspondence and business forms (including, without limitation, letterhead and invoices), and other documents related to the Bank Accounts existing immediately before the Petition Date, without reference to its status as debtor-in-possession.

35.    By the Cash Management Motion, the Debtor also requests that the Court authorize the Bank to (a) continue to maintain, service, and administer the

Bank Accounts and (b) debit the Bank Accounts in the ordinary course of business

on account of (i) checks drawn on the Bank Accounts that are presented for payment

at the Bank or exchanged for cashiers' checks prior to the Petition Date; (ii) checks

or other items deposited in the Bank Accounts prior to the Petition Date that have

been dishonored or returned unpaid for any reason (including associated fees and

costs), to the same extent the Debtor was responsible for such items prior to the

Petition Date; and (iii) undisputed, outstanding service charges owed to the Bank as

of the Petition Date.

> **B.     Debtor's Motion for Interim and Final Orders Pursuant to Sections 105(a), 362, and 541 of the Bankruptcy Code (I) Establishing Procedures for (A) Certain Transfers of Equity Interests, and (B) Taking or Implementing Certain Other Actions Affecting the Interests of the Debtor and (II) Scheduling a Final Hearing**

36.     To preserve the NOLs and other tax attributes (the "Tax Attributes"),

the Debtor has filed the Motion for Interim and Final Orders Pursuant to Sections

105(a), 362, and 541 of the Bankruptcy Code (I) Establishing Procedures for (A)

Certain Transfers of Equity Interests, and (B) Taking or Implementing Certain Other

Actions Affecting the Interests of the Debtor and (II) Scheduling a Final Hearing (the

"Trading Motion"). Although the Debtor's Tax Attributes that remain after the

effective date of a Chapter 11 plan may be reduced by the amount of any Debtor

cancellation of indebtedness income realized pursuant to such plan, such Tax

Attributes will be available to the reorganized Debtor (and the other members of its

consolidated group) to offset income realized through the taxable year that includes

15

the plan's effective date. Even after taking into account any anticipated cancellation of debt impact on the Debtor, its remaining Tax Attributes could translate into substantial future tax savings over time and thus provide tremendous value for the Debtor and its stakeholders.

37.     Additionally, there are certain other actions, outside of the ordinary course, that could be taken or implemented by non-Debtor third parties that would affect the Debtor's interest in and ability to use the Tax These actions include, but are not limited to, issuing new equity securities in any of the non-Debtor affiliates of the Debtor or selling certain assets outside of the ordinary course of business.

38.     By the Trading Motion, the Debtor seeks entry of an order setting procedures for trading in the Debtor's stock, with the goal of preserving the NOLs and Tax Attributes.

> **C.     The Relief Sought in the First Day is Critical to the Success of the Chapter 11 Case.**

39.     I have reviewed the First Day Motions and proposed orders granting the relief requested in the First Day Motion, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

40.     Moreover, I believe that the relief sought in the First Day Motion (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving the maximization of the Debtor's value.

41.     Accordingly, for the reasons stated herein and in the First Day Motion filed concurrently or in connection with the commencement of this case, I respectfully request that each of the First Day Motion be granted.

V.     CONCLUSION

42.     The Debtor's ultimate goal in this Chapter 11 Case is to maximize the value of the Debtor's estate for the benefit of its creditors and stockholders through a chapter 11 plan process. Approval of the First Day Motion will help the Debtor realize that goal by allowing it to focus its energies on a successful Chapter 11 Case which will maximize creditor recoveries. I believe that if the Court grants the relief requested in each of the First Day Motion, the prospect for completing a successful chapter 11 process will be substantially enhanced.

43.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motion be granted, together with such other and further relief as is just.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of June, 2013.

Respectfully Submitted,

William T. Ratliff, III
Chairman, President, and Chief
Operating Officer

18

## EXHIBIT A

**Organizational Chart for Debtor and its Non-Debtor Direct and Indirect Subsidiary Companies**

# ORGANIZATIONAL CHART

Triad Guaranty, Inc.
(Delaware corporation)

↓

Triad Guaranty Insurance
Corporation (Illinois
domiciled insurance
company)

↓

Triad Guaranty Assurance
Corporation (Illinois
domiciled mortgage guaranty
reinsurance company)